[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10904

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 10, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00752-CV-J-99

JOHN C. MARQUARD,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 10, 2005)

Before EDMONDSON, Chief Judge, CARNES and HULL, Circuit Judges.

HULL, Circuit Judge:

John C. Marquard appeals the district court's denial of his 28 U.S.C. § 2254 petition challenging his death sentence. On appeal, Marquard argues primarily that his trial counsel was ineffective in various ways during the penalty phase of his trial. After review and oral argument, we affirm Marquard's death sentence.

## I. BACKGROUND

### A. Murder of Stacey Willets

Marquard was convicted of first-degree murder and sentenced to death for the 1991 murder of his girlfriend, Stacey Willets. After Willets's remains were discovered by hunters in the woods, Marquard and codefendant Michael Abshire were arrested, and both confessed. The facts relating to the murder, as recited by the Florida Supreme Court, are as follows:

> John Marquard, Mike Abshire, and the victim, Stacey Willets, decided to move from North Carolina to Florida in June 1991 using Stacey's car and sharing expenses. Prior to leaving, Marquard and Abshire discussed killing Stacey for her car and money, and during a stop in South Carolina Marquard told Abshire that he was going to kill her because he was tired of arguing with her. In St. Augustine, Marquard and Abshire formulated a plot to kill Stacey that night after luring her into the woods.
>
> Marquard and Abshire invited Stacey to attend a party, drove her to a deserted area, and walked her into the woods. Marquard grabbed her from behind, stabbed her, threw her to the ground, and sat on her back. She was still breathing, so Marquard held her head under the rainwater that had accumulated in a puddle until she stopped breathing. When her body convulsed, he held her head underwater again. Abshire then stabbed her and the two tried to decapitate her. Marquard was arrested and confessed, saying he remembered walking

2

into the woods with Stacey and standing over her body with a knife in hand. Abshire testified at trial, giving a detailed account of the murder.

Marquard v. State, 641 So.2d 54, 55-56 (Fla. 1994). Marquard was convicted of first-degree murder and armed robbery.

## B. Guilt Phase of Trial

At trial, Marquard contended that he was present for the murder of Stacey Willets, but that codefendant Abshire, and not Marquard, actually initiated and committed the murder.[1] Abshire, on the other hand, testified that it was Marquard who planned to kill and ultimately did kill Willets.

Abshire testified that Marquard first mentioned killing Willets in South Carolina, at the first stop on their trip. Some luggage had fallen off the car, where Marquard had tied it down, and Marquard and Willets fought over the incident. Marquard then discussed with Abshire killing Willets, as follows:

> [STATE ATTORNEY]: Where is the first place that you stopped?
> [ABSHIRE]: We stopped at a . . . like a convenience store/gas station in South Carolina when the sea bags that were on the trunk fell off.
> [STATE ATTORNEY]: Okay. And was . . . anything unusual occur there?
> [ABSHIRE]: Other than the sea bags, yes, sir.
> [STATE ATTORNEY]: Okay. Explain to the jury what that is. . . .

---

[1] In his confession to the police, Marquard confessed that he and Abshire took Willets out into the woods, but claimed no memory of the actual murder. He stated that after they got out in the woods, the next thing he knew, Willets was face-down on the ground and Marquard was over her with a knife in his hand, both of them bloodied.

3

[ABSHIRE]: Okay. I decided I was going to tie the stuff down on the trunk, because John had tied it down before and it came loose. So him and Stacy [sic] went inside the store to get drinks and use the bathroom, you know. And Stacy [sic] came out and asked me if I wanted something to drink, and she went back in to get me something while John came out. And he . . . see, I was going to drive from there, and he told me I should find a . . . like a farm road off the side off the road and – like a hunting road or something – and go back in there and, you know, find like a . . . a lonely spot like, and he was going to kill Stacy [sic] and leave her there.

[STATE ATTORNEY]: Did he say why?

[ABSHIRE]: He was tired of arguing and everything. They – they argued about the stuff being tied on the trunk and that he didn't do a good job and it had fallen off, and he didn't like that and it was just –

Abshire testified that Marquard again discussed killing Willets after they arrived in St. Augustine and Marquard and Willets had an argument about their search for jobs. Willets stayed back in the motel room the three shared while Marquard and Abshire went out to look for jobs and to look for a room in a boarding house. When Marquard and Abshire spoke to the proprietor of the boarding house, Marquard told her that it would just be Marquard and Abshire. When Abshire questioned Marquard about Willets, Marquard indicated that he intended to kill her, and the two then discussed how they would kill her:

[STATE ATTORNEY]: Okay. Well, did you ever question Mr. Marquard about why he said it would just be you two?

[ABSHIRE]: When we got in the car later, I asked him, you know, "What are we going to tell Miss Rosa about Stacy [sic]?"

And he said that – you know, he again brought up killing her.

[STATE ATTORNEY]: Okay. I need you to tell the jury exactly what was said, to the best of your recollection.

4

[ABSHIRE]: Actually started planning on what to do and . . .

[STATE ATTORNEY]: By saying what?

[ABSHIRE]: By . . . said that we're going to take her someplace, find one of them little lonely roads just like before, and preferably . . . it's like usually when you cross over a river, there's like an access road to get underneath the bridge for fishermen, and he said there was a river down State Road 16, I think, and we're going to go there and take her back there and tell her there's a party going on back there.

[STATE ATTORNEY]: Did you come up with some ideas on how to do this, as well?

[ABSHIRE]: Yes, sir. We did.

[STATE ATTORNEY]: Okay. What did you suggest?

[ABSHIRE]: Pretty much a basic consensus. I couldn't really say who thought of what particular thing. I mean, it's like a . . . a general scenario, you know, go back into some woods somewhere, I mean, because there's a guy we knew who did it exactly that way before – or, I knew. I'm not sure if John knows him.

[STATE ATTORNEY]: So is it – is it a question-and-answer period –

[ABSHIRE]: Yes, sir.

[STATE ATTORNEY]: – or are you both coming up with ideas and –

[ABSHIRE]: Yes. I mean it isn't really anything. I mean, I was worried; but it still wasn't really a serious thing, you know. I mean . . .

[STATE ATTORNEY]: But you were both talking about killing her.

[ABSHIRE]: Yes, sir.

According to Abshire's testimony, when he and Marquard arrived back at the motel, they told Willets there was going to be a party that night and where it was going to be, and the three began getting ready to go to the party. After drinking a beer, Marquard, Abshire, and Willets drove out Highway 16, with Marquard at the wheel. Abshire testified that he and Marquard looked for a bridge with water because they had discussed leaving Willets's remains where they could

5

be destroyed by alligators. When they found a bridge over water, they got out and followed a trail through the woods with Willets walking between Marquard and Abshire. They were unable to find a trail to the water they had hoped for, but it was raining hard and the ground was very wet, with shin-deep water in some parts. The three of them decided it was not worth walking through the thick, wet trails, and decided to turn back. When Abshire came to a clearing in the woods, he heard a muffled scream and turned around to see Marquard murder Willets:

> [ABSHIRE]: . . . John had Stacy [sic] from behind and was like backing up, keeping her feet off the ground, and she was struggling and still screaming. And then I saw his hand come up, and I saw the knife in his hand, and I saw him stab her at least once. I don't know how many other times. I saw him stab her one time. And then he threw her on the ground in the middle of the clearing and sat on her back, pretty much looked at her, and then he saw she was still alive. And the water was, you know, pretty deep; so he . . . he held her head under water till she quit breathing.
>
> Then he handed me the knife, and I washed the blood off it. And he sat there just looking at her. And then she jerked like, you know, like – like a gasp or something, and I thought she was still alive. And he put her head under water again and, you know, made sure.
>
> Then he told me to stab her. She was already dead, but he told me to stab her. So I did. And I washed it off and gave the knife back to him.

Abshire testified that he then, at Marquard's direction, hacked at Willets's neck with a second knife. Marquard then tried to dig a hole to bury Willets's body but gave up because there were too many roots.

6

Abshire testified that the motivation for killing Willets was for her car and the remaining $150 she had at the time of the killing. After killing her, they went through her pockets, took some money and a knife, and returned to the motel to shower and wash their bloody clothes.

At the close of the trial, the jury unanimously found Marquard guilty of one count of first-degree murder and one count of armed robbery with a deadly weapon.[2]

## C. Evidence at Penalty Phase

During Marquard's penalty phase, the State presented North Carolina parole officer Patricia Rawls, who testified that Marquard was on parole in North Carolina at the time of the killing, a statutory aggravating factor under Florida law.

To establish mitigating factors, the defense counsel presented testimony from Dr. Harry Krop, a licensed Florida psychologist with a wealth of experience in the field of forensic psychology. Because Dr. Krop was the defense's only mitigation witness, we outline Dr. Krop's testimony in detail. Dr. Krop had previously evaluated 472 people who had been charged with first-degree murder

---

[2]Abshire was tried separately, convicted, and sentenced to death. The Florida Supreme Court subsequently reversed Abshire's conviction and vacated his death sentence because, during Abshire's trial, the assistant state attorney indicated that he sought to exclude women from the jury solely based on gender. Abshire v. State, 642 So. 2d 542, 544-45 (Fla. 1994). On remand, Abshire was sentenced to life imprisonment. Marquard v. State, 850 So. 2d 417, 422 (Fla. 2002).

and had testified about forty-five times in the penalty phase of first-degree murder trials, generally as a defense witness but on several occasions as a consultant to the State.

Dr. Krop saw Marquard on two different occasions, at which times he interviewed Marquard and also performed a battery of personality and neuropsychology tests. Dr. Krop also reviewed Marquard's psychiatric records, psychiatric hospital records, social service records, and records from various facilities in which Marquard resided as a juvenile. In addition, Dr. Krop reviewed various depositions and police records relating to the offense of conviction and interviewed Marquard's mother and father by telephone. Dr. Krop testified that he took all these materials into consideration in forming an opinion as to Marquard's mental status.

Based on his interviews with Marquard, his review of the relevant records and depositions, and his interviews with family members, Dr. Krop testified in detail about Marquard's dysfunctional family; alcoholic and abusive mother; abusive and distant father; and deprived and troubled childhood. Dr. Krop reviewed how Marquard had an unstable family life and had been deprived of the emotional care and support he should have received.

Dr. Krop started with Marquard's dysfunctional family as early as when

8

Marquard was age six, and described his parents' divorce and physical abuse of

Marquard:

>I would have to say that I guess the most significant aspect of his background is what we refer to as a dysfunctional family. Mr. Marquard's parents separated and/or divorced soon after when he was rather young, somewhere around six or seven years old. At that time, and depending on who I talked to in terms of the mother or father, basically, it was a very bitter divorce, and as a result of the custody battle, Mr. Marquard, the defendant, stayed in the custody of his mother, whereas his two sisters went into the custody of his father. According to his father, the reason that he obtained custody of the two daughters was because the mother was physically abusive of the two girls. According to the mother, the father was physically abusive of her and also Mr. Marquard. Mr. Marquard basically reports that he was physically abused by both of his parents.
>
>The mother admits and the records document that the mother has a history of alcohol abuse and has been treated as an inpatient for her alcohol problems.

As a result of his parents' separation, Marquard did not see his father for

many years and did not have a relationship with his father during childhood and

adolescence. Dr. Krop opined it was very important for Marquard to have a

relationship with his father during this period:

>At the time that they were separated, according to the father, he was not able to find John for close to four or five years, that he did not have any contact with his son for four or five years.
>
>The mother indicates – when I asked her why John did not see his father for four or five years, she indicated that John essentially did not want to see his father and because he was afraid of his father.
>
>So both parents basically blame the other for why John was not involved in any way with the father for a significant period of his life. It was the period of his life in terms of his childhood, as well as the

area going through puberty, a time when I think it's very important for a son to be with his father. But in any event, whatever the facts were, he did not have a relationship with his father.

Dr. Krop also described how each of Marquard's parents alienated Marquard from the other parent:

> After talking to the mother and father, it became clear that there were a behavior pattern on both of their parts which we now refer to as Parental Alienation Syndrome. It's essentially when one parent, usually the custodial parent, does things or says things to the child or in front of the child which attempts, either consciously or unconsciously, to alienate the child from the other parent. At that time period, I don't believe there was terminology for that; but it's been a fairly common phenomenon for several years.

Dr. Krop described how Marquard began drinking and using drugs at around eight or nine years of age:

> Basically, also just staying with the childhood, it was at the time period when the parents were separated that John started getting into additional trouble. He indicates that he actually started drinking when he was eight years old – not regularly at that time; but he started using drugs and alcohol somewhere around eight or nine years old. And at some point, of course, that continued and became heavy and more regular.

Dr. Krop also recounted how Marquard reported that he was sexually abused as a child by a neighbor:

> John also reports that when he was five or six years old that he was sexually abused by an adult neighbor. He said that the abuse consisted of frequent anal sex. He indicated that he never told his mother or his father of this sexual abuse, but that he has informed some mental-health counselors about the abuse.

10

During that time period, also, as I indicated, he was not allowed to see his father; but also because the sisters, his two older sisters, went with the father, he had no contact with his sisters during that time period, and according to his father, he . . . John was close to his sisters prior to that separation.

That's in a nutshell what occurred when John was a child in terms of the parental situation.

In essence, Dr. Krop described Marquard as having abusive parents and having been perhaps sexually abused, with the result that Marquard was drinking and using drugs by age eight or nine.

Dr. Krop then testified about Marquard's transient adolescence, in which he was then separated from his family and placed in boys' homes, foster care, and a state hospital. At age eleven, Marquard was sent to a boys' home, where he stayed for eighteen months.[3] Dr. Krop testified that "[a]ccording to the records at the boys' home, he was doing relatively well and was making some progress until around the 15th- or 16th-month period, at which time he had a home . . . visit." After his home visit with his sisters, who reportedly were in a motorcycle gang, Marquard "regressed and came back indicating talking about more violent type of things, talking about weapons." According to the boys' home records, Marquard's

---

[3]Dr. Krop testified that Marquard was sent to a boys' home because he was having difficulty in terms of adjusting to living with his mother and he was starting to get into trouble in terms of having behavior problems, and he was sent to a boys' home where he stayed for . . . he was 11 years old at the time, and he stayed in this boys' home for 18 months.

11

new interest in violence was because of his association with his sisters.

Dr. Krop further explained the negative impact Marquard's mother continued to have on Marquard. During Marquard's time in the boys' home, the records suggest that the mother was telling Marquard during some of the home visits that she would welcome Marquard back home with them. According to the records, "[w]hen [Marquard] would come back, that would be his expectation, when he came back to the boys' home." However, "when the boys' home staff asked the mother to come in and meet with them and talk about her taking home [Marquard], she would not show up for the meetings." There were regular promises made, but then no follow-through on the part of Marquard's mother.

After Marquard got back to the boys' home following his visit with his sisters, the boys' home staff felt they could no longer treat him and that he needed more intensive work. The boys' home then referred Marquard to a "therapeutic foster-care situation," which is a family specifically trained in working with emotionally disturbed children.

According to Dr. Krop, Marquard went into that system for about fifteen months, when he was around age thirteen to fourteen. At the end of that time, the father took Marquard home with him for about two years.

During that two-year period with his father, Marquard was about fifteen and

12

sixteen and was again having difficulty adjusting. He had difficulty in school and exhibited behavior problems, at which time he was referred to a group home for emotionally disturbed adolescents.

Marquard stayed in that group home for just a short period of time because his problems were too serious. The group home referred Marquard to a state hospital, where he stayed for sixteen months. Marquard was in a state hospital at ages sixteen and seventeen.

After Marquard was released at about age seventeen from that state hospital, it was determined that his family situation was too unstable, but because of his age, he could not be placed back in a foster care situation. As a result, he lived on his own thereafter. According to Dr. Krop, from that time on, Marquard "lived in a transient type of existence in terms of moving around from one place to another, having difficulty adjusting and having any type of stable environment."

Dr. Krop also summarized the results of the most recent evaluation, which was in North Carolina in 1989. Although all professionals recommended that Marquard needed stability, consistency and support, the records reflect that he was never able to get that environment from his family. Dr. Krop explained that the professionals all "indicated that the rejection that [Marquard] had from significant others has contributed to his difficulties."

13

Dr. Krop concluded that the records "support the [reports of] instability and the dysfunctional family unit and suggest that many of [Marquard's] current problems adjusting to society and functioning adaptively in society . . . relate back to the instability, his rejection and low self-esteem as a result of the dysfunctional family." As a result of his family instability and lack of supervision, Marquard started drinking and using drugs at a very early age. Dr. Krop added that Marquard has a history of alcohol and drug abuse.

Dr. Krop essentially opined that all this unfortunate history, taken together, has resulted in Marquard being "a seriously disturbed individual with a number of personality deficiencies and defects."

After this discussion of Marquard's background, Dr. Krop then discussed his diagnosis. Dr. Krop discussed Marquard's history of substance abuse and concluded that Marquard did not suffer from significant intellectual or neurological deficits:

> Diagnostically, let me say that in my testing from him, although he reports a number of head injuries, he also reports some blackouts and hallucination. I would say that from what I can tell, almost all of those were related to drug . . . drug ingestion as opposed to any type of psychotic illness.
> I did a neuropsychological evaluation to determine whether there was any neurological or organic basis for some of these problems, and the results were negative. I did not find any neurological aspects . . . as a contributing factor.

14

Dr. Krop further noted that Marquard was a "fairly bright young man," with an IQ in the average range. Dr. Krop thus opined that "intellectually or neuropsychologically, there do not seem to be any significant problems."

Dr. Krop then testified that what Marquard presented, from a diagnostic standpoint, was a "number of different personality problems." Dr. Krop explained that every individual develops certain personality traits, which are traceable to genetic predisposition and also the individual's environment and upbringing and values in the home. He further explained that as a result of those factors, there are individuals who develop maladaptive personality traits, causing them difficulty functioning in society. This type of personality profile is called a "personality disorder," and the type of personality disorder "can vary depending on the particular criteria that are available or that we know of with regard to that individual in terms of the particular personality."

Dr. Krop then opined that Marquard had traits typical of many different personality disorders and that he presented a "personality disorder not otherwise specified" and also was a substance abuser:

> He has been diagnosed with different types of personality disorders in the past. I would say that when I try and put a specific diagnosis on him, because he fits into so many different categories and his personality traits basically are across the different personality diagnoses, I would have to diagnose him as what we call a personality disorder not otherwise specified; in other words, the criteria are from

15

across the different personality disorders as opposed to just fitting into one particular personality disorder. I would also have to diagnose him as a substance abuser, based on his history, both reported to me and in the records.

Dr. Krop also elaborated on the traits Marquard exhibited from various personality disorders, including borderline, explosive, and antisocial personality traits. Dr. Krop first described the "borderline" personality traits exhibited by Marquard, stating that individuals with borderline traits react to stress with inappropriate acting out, tend to be manipulative, and engage in "self-injurious, self-destructive type of behavior, oftentimes for attention-seeking purposes." Although borderline personalities can engage in certain "psychotic-like" behaviors, Dr. Krop clarified that the only evidence he had of that type of behavior in Marquard was, he believed, the result of hallucinogenic drugs.

Dr. Krop then described Marquard's tendency to react to stress with disproportionate anger and violence, typical of an "explosive" personality disorder:

He's been diagnosed in the past as having explosive personality disorder. This is an individual who reacts to stress in a manner that is totally out of proportion to the given situation. It might be a situation that might create some anger or frustration in all of us; but the person who has poor impulse control and low frustration tolerance essentially can explode and, of course, sometimes engage in violent behavior. So we have those features from that type of personality disorder.

Dr. Krop further explained that Marquard presented certain features associated with an "antisocial" personality disorder, which Dr. Krop described:

16

> We have certain features from an antisocial personality disorder, the individual who does not particularly benefit from or a person who does not particularly look at the consequences of his behavior, a person who basically is fairly selfish and a person who engages in behaviors that are against the values of society and the rules of society.

Dr. Krop then noted that Marquard exaggerated and even lied – for example, telling people that he was in the Navy Seals – to build up his self-esteem. Dr. Krop opined that "these kind of grandiose, manipulative kinds of behavioral characteristics are all reflective of a person with a personality disorder of the nature that I described."

After Dr. Krop's testimony about Marquard's background and his diagnoses, the State presented Dr. Jack Merwin, an expert clinical psychologist. Dr. Merwin testified that, based on his review of Marquard's background and conduct, Marquard suffered from antisocial personality disorder, a disorder common among inmates whom he had evaluated. Dr. Merwin distinguished a personality disorder such as Marquard's from what is generally considered "mental illness" in that a personality disorder is more personality-based and less focused on the mental process.

## D. Shackling During the Penalty Phase

On appeal, Marquard contends that he was shackled before the jury during some portion of his trial's penalty phase. Thus, we examine what the record shows

17

in that regard. We can locate no evidence in the record showing that Marquard was shackled during the penalty phase. Additionally, Marquard's trial counsel never objected to any shackling.

In fact, this Court directed Marquard to file record citations where any shackling occurred at trial. In reply, Marquard referenced only one place in the record where Marquard apparently entered the courtroom while the jury was present, and the record of the event reads as follows:

> (In open court.)
> THE COURT: All right. We're waiting on Mr. Marquard. I think he had to go to the restroom. He'll be back in a second.
> (Defendant present.)
> THE COURT: All right. Now I would ask that the following people please step down and report to Judge Wienberg in the courtroom at the other end of the hall. . . .

The above events took place during jury-selection proceedings, not during the penalty phase. In any event, the record contains no evidence that Marquard was shackled before the jury.

## E. Jury Instructions and Recommendation

After hearing the above evidence, the State trial court instructed the jury regarding its duty to recommend a sentence for Marquard. The State trial court instructed the jury to "render to the Court an advisory sentence based upon [its] determination as to if sufficient aggravating circumstances exist to justify the

18

imposition of death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist."

The trial court also instructed the jury that the aggravating circumstances it might consider were limited to any of the following four: (1) the capital felony was committed by a person under a sentence of imprisonment or community control, including parole; (2) the crime was committed while the defendant was engaged in the commission of a robbery or was committed for financial gain; (3) the crime was especially heinous, atrocious, or cruel; and (4) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

With regard to the third potential aggravating factor, the "heinous, atrocious or cruel" ("HAC") factor, the trial court instructed as follows:

> "Heinous" means "extremely wicked or shockingly evil." "Atrocious" means "outrageously wicked and evil." "Cruel" means "designed to inflict a high degree of pain with utter indifference to or enjoyment of the suffering of others."
>
> The kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional acts that show that the crime was consciousless or pitiless and was unnecessarily torturous to the victim. If the victim in this case lost consciousness, any event which occurred after unconsciousness began cannot be considered as evidence of the especially – especially wicked, evil, atrocious or cruel nature of the crime. Any event after the death of the victim cannot be considered as evidence of the especially wicked, evil, atrocious or cruel nature of the crime . . . .

19

Prior to trial, the defense filed written objections to the standard jury instructions. In those written objections, the defense objected to the HAC instruction on the ground that it was unconstitutionally vague in that it failed to genuinely limit the class of people eligible for the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. At trial, the defense also objected to the HAC instruction, again on the ground that it was unconstitutionally vague and also on the ground that the evidence did not support the HAC aggravating factor.[4]

Trial counsel also asked the trial court, if it overruled the objection and gave the HAC instruction, to add onto the standard jury instruction the limitation that

_____

[4]On appeal in this Court, Marquard argues that his trial counsel was ineffective in failing to challenge the HAC instruction on the ground that it was unconstitutionally vague, and that therefore his appellate counsel could not raise the issue because trial counsel failed to object and properly preserve the claim for appellate review. The State, on the other hand, argues that the HAC-constitutional claim was procedurally defaulted because it was not raised on direct appeal. Likewise, the Florida Supreme Court concluded that this HAC-constitutional issue was procedurally barred because it was not raised on direct appeal. Marquard v. State, 850 So. 2d at 423 n.2.

In fact, Marquard's trial counsel did object in writing and again at trial to the HAC instruction on that basis. On direct appeal, his appellate counsel also argued the same issue under "Point XII: Constitutionality of Section 921.141, Florida Statutes." In that XII section of appellant's initial brief, Marquard's appellate counsel noted that trial counsel had objected to the standard instructions and that the objections had been overruled and stated that "Appellant again asserts each objection to the Standard Instructions and argues that the trial court's ruling denied due process, a fair trial and a reliable sentencing recommendation" in violation of the Fifth, Sixth, Eighteenth, and Fourteenth Amendments. In subsection (i), entitled "Heinous, Atrocious, or Cruel," Marquard's appellate counsel again explicitly objected to the HAC instruction as unconstitutionally vague and arbitrary. Thus, Marquard's ineffective-assistance-of-counsel claim lacks merit.

events after the victim lost consciousness or death could not be considered as evidence of the wicked, evil, atrocious, or cruel nature of the crime, as follows:

> If the victim in this case lost consciousness, any event which occurred after unconsciousness began cannot be considered as evidence [of the] especially wicked, evil, atrocious, or cruel nature of the crime. Any event after the death of the victim cannot be considered as evidence of the especially wicked, evil, atrocious, or cruel nature of the crime. If you have reason to doubt whether some particular event occurred after unconsciousness or death, you cannot consider that event in deciding whether the State has established this aggravating circumstance.

(Quotation marks omitted.) Although overruling the objection to the constitutionality of the HAC instruction, the trial court did give the first two sentences of this requested limiting instruction but not the last sentence.

The trial court further explained (1) that if the jury did not find that aggravating circumstances justified imposition of the death penalty, it should recommend life imprisonment, and (2) that if it did find that one or more sufficient aggravating circumstances existed, the jury then had the duty to determine whether any mitigating circumstances existed that outweighed the aggravating circumstance or circumstances. As to potential mitigating circumstances, the trial court instructed: "Among the mitigating circumstances you may consider if established by the evidence are any aspects of the defendant's character or record and any other circumstance of the offense."[5] The trial court further instructed that while

---

[5]The trial court did not instruct the jury on any statutory mitigating factors.

21

aggravating circumstances must be established beyond a reasonable doubt, mitigating circumstances need not be. Rather, it instructed the jury: "If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established."

After the jury retired to deliberate, the defense moved for a directed sentence of life imprisonment, arguing that the State had failed to prove aggravating circumstances sufficient to allow a reasonable jury to recommend a death sentence. The trial court denied the motion.

After deliberating, the jury unanimously recommended a sentence of death.

The defense then moved for a new trial, asserting, inter alia, that Marquard's trial was tainted by cumulative error. The trial court denied the motion.

## F. Sentencing

At sentencing, the State trial court recounted the details of Willets's murder and Marquard's role in the murder, stating that there was overwhelming evidence that the idea of killing Willets originated with Marquard. The trial court found that these four aggravating factors were proved beyond reasonable doubt: (1) the crime was committed while Marquard was on parole; (2) the crime was committed while Marquard was engaged in the commission of a robbery or was committed for financial gain; (3) the crime was especially heinous, atrocious, or cruel; and (4) the

22

crime was committed in a cold, calculated, and premeditated manner without any

pretense of moral or legal justification.

The trial court described the facts supporting each aggravating factor. With

regard to the HAC aggravator, the trial court restated the instruction defining the

factor and then explained why Marquard's crime met this definition:

> Chopping and stabbing and attempting to drown a defenseless, unsuspecting 22-year-old woman with a Bowie knife, a dagger and attempting to cut her head off with a Gurka head knife is extremely wicked and shockingly evil. Such conduct is designed to inflict a high degree with indifference to the suffering of Stacey Ann Willets.
>
> Marquard cut her throat, stabbed her in the chest and attempted to drown her and attempted to behead her. Mr. Marquard threw her to the ground after cutting her throat and stabbing her. He held her face under water until she stopped breathing. When she started breathing again, he then held her face under water until she finally stopped breathing.
>
> Abshire stabbed her at Marquard's instruction. Then Marquard struck the back of her neck with his Gurka head knife. Abshire did the same thing with his Bowie knife.
>
> Stacey did not die instantly. She was breathing when Marquard first tried to drown her. She started breathing after the first attempt. Marquard again tried to drown her.
>
> The attack was without provocation, and she vainly sought to defend herself by struggling. Marquard had one hand over her mouth and a knife in the other hand cutting her throat and stabbing her in the chest.
>
> Attempting to drown the victim is comparable to strangulation and would involve foreknowledge of death, extreme anxiety or fear.

The trial court found that no statutory mitigating factors existed. With

regard to non-statutory mitigating factors, the trial court made mitigation findings

23

that Marquard had an unstable family life, difficult childhood, divorced parents, alcoholic mother, no emotional support, and a personality disorder, but concluded that any mitigating factors relating to that background and diagnosis were overwhelmed by the aggravating factors in this case:

> The Court finds that the defendant had an unstable family life as a child and lacked the emotional support and care he should have received.
>
> Defendant reported to Doctor Krop that he had a number of head injuries. Those are not documented, nor did Doctor Krop describe how they occurred, when they occurred or the nature of the injuries. Such testimony and those of blackouts as related to the jury by defendant via Doctor Krop are highly suspect. The Court places very little weight on such testimony.
>
> Doctor Krop diagnosed defendant as [sic] a personality disorder not otherwise specified. In other words, defendant has characteristics which fit different personality diagnoses. Those traits are inappropriately acting out in response to stress, being manipulative, self-injurious, self-destructive, engaging in attention-getting behavior, explosive personality, poor impulse control, low frustration tolerance, failing to look at consequences of his behavior, basically selfish, a liar and a person who engages in behaviors that are against the values of society. Doctor Krop also – mentioned also that such a person can engage in psychotic behavior, but there's no evidence of such behavior.
>
> Doctor Jack Merwin, an equally qualified psychologist, opined that the defendant suffers from an antisocial personality disorder, which affects three percent of American males.
>
> The Court finds that the defendant suffers from either a personality disorder not otherwise specified or an antisocial personality. There is not much difference between the two.
>
> The Court further finds defendant did not have a stable home, but had divorced parents and an alcoholic mother with whom he lived. He had a difficult childhood. He may have been sexually abused on one occasion. Defendant used various drugs and alcohol; however,

24

there is no evidence that the use of those had anything whatsoever to do with the commission of the murder.

In summary, the four aggravating circumstances overwhelm the mitigating circumstances. The strongest mitigating circumstance is defendant's difficult childhood. He did not have a stable home. He was in a group home, a therapeutic foster home and the state hospital. He lived with an alcoholic mother.

The trial court then recounted the brutal, senseless murder of Willets and concluded: "The murder of Stacey Ann Willets was a cold-blooded, premeditated murder. The death penalty is the appropriate punishment."

The trial court then sentenced Marquard to death.

## G. Direct Appeal

On direct appeal to the Florida Supreme Court, Marquard, represented by new counsel, argued that the trial court erred in these matters: (1) excusing for cause a death-qualified venireperson; (2) refusing to suppress knives and camouflage pants recovered from his room; (3) permitting the State to introduce evidence that Marquard had discussed with Abshire how to kill people with knives and how to make a "silent kill"; (4) denying the defense's request for judgment of acquittal on the armed robbery count; (5) refusing to allow defense counsel to argue to the jury concerning the consequences of life imprisonment; (6) permitting cross-examination into Marquard's criminal history during the penalty phase; (7) instructing on and finding the aggravating circumstance of commission while

25

under a sentence of imprisonment; (8) giving the HAC instruction; (9) finding that the murder was for pecuniary gain; and (10) finding that the murder was cold, calculated, and premeditated. See Marquard v. State, 641 So. 2d at 56 n.3. Marquard also argued that: (11) cumulative errors required reversal; and (12) Florida's death-penalty scheme, including the standard jury instructions regarding aggravating factors, was unconstitutional. See id. Marquard did not raise any shackling issue on direct appeal.

The Florida Supreme Court affirmed Marquard's convictions and sentences. Marquard then filed a motion for rehearing, which was denied. See id. at 58. The Florida Supreme Court listed the twelve issues raised by Marquard on direct appeal, id. at 56 n.3, but discussed only six of those issues in some detail. As to the remaining six, the Florida Supreme Court summarily affirmed the trial court. Id. at 58 n.4.

Among those claims summarily affirmed were Marquard's claims that the trial court erred in instructing on and finding that the murder was especially heinous, atrocious, or cruel and that the Florida death-penalty scheme, including the HAC aggravator, was unconstitutional. The Florida Supreme Court simply stated "no error" with regard to the giving of the HAC instruction, and "no merit" with regard to the constitutionality of the HAC instruction given. Id.

Marquard then filed a petition for a writ of certiorari in the United States Supreme Court, seeking review on the following basis: "THE TRIAL COURT'S RESTRICTION OF DEFENSE COUNSEL'S CLOSING ARGUMENT CONCERNING DEFENDANT'S FUTURE DANGEROUSNESS VIOLATED THE DUE PROCESS CLAUSE AND REQUIRES A NEW TRIAL AS TO PENALTY IN LIGHT OF THIS COURT'S DECISION IN Simmons v. South Carolina, 512 U.S. __, 129 L.Ed.2d 133, 114 S. Ct. __ (1994)." In his petition, Marquard argued that the trial court erred in refusing to allow defense counsel to inform the jury that the court could sentence Marquard to consecutive life sentences for the armed robbery and the murder, which would likely ensure that Marquard would spend the rest of his life in prison. The Supreme Court denied the petition. Marquard v. Florida, 513 U.S. 1132, 115 S. Ct. 946 (1995).

## H. Post-conviction 3.850 Motion

Marquard then filed in the Florida circuit court a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, and subsequently amended that motion. In the amended 3.850 motion, Marquard asserted the following claims: (1) that his trial counsel at the guilt phase of his trial was ineffective; (2) that his trial counsel at the penalty phase was ineffective in failing to investigate and present sufficient mitigating evidence; (3) that his trial counsel

27

was ineffective at the penalty phase in failing to object to and/or preserve various erroneous rulings by the trial court and various statements by the court and the prosecutor; (4) that the Florida Bar Rules unconstitutionally prohibited counsel from interviewing jurors to determine if they followed the statutory sentencing guidelines; (5) that the jury instructions as to aggravating factors, including the HAC instruction, were unconstitutionally vague, overbroad, and inaccurate, and that trial counsel was ineffective in not objecting to, or preserving an objection to, the jury instruction as to the "cold, calculated, and premeditated" aggravating factor on that basis;[6] (6) that execution by electrocution is cruel and unusual and violates the United States and Florida Constitutions; and (7) that Marquard was unable to prepare an adequate 3.850 motion until he received certain public records and was accorded time to review them and conduct a follow-up investigation.

While Marquard objected to the constitutionality of the HAC instruction, his 3.850 motion did not argue that his trial counsel failed to raise the HAC-constitutionality issue or was ineffective in failing to raise or preserve it. In fact, the record shows Marquard's trial counsel did object to the HAC instruction as unconstitutional.

Additionally, in his amended 3.850 motion, Marquard <u>for the first time</u>

---

[6]Marquard also alleged ineffective assistance of trial counsel as to other jury instructions on other bases.

28

raised a shackling claim (claim eight). Marquard's 3.850 motion claimed that his constitutional rights were violated when he was handcuffed in front of the jury "during his penalty phase," and that his trial counsel was ineffective in failing to object to that shackling. Thus, Marquard's 3.850 motion raised his shackling claim both as a substantive constitutional claim and as an ineffective-assistance-of-counsel claim. As to this shackling claim, Marquard's amended 3.850 motion states: "After Mr. Marquard was found guilty of Ms. Willets' murder, he was placed in handcuffs during the penalty phase. The handcuffs were in full view of the jury." (Emphasis added.) The 3.850 motion contained no citations to the record that would show the shackling occurred, and Marquard made no proffer nor offered any affidavit relating to the shackling claim.

The 3.850 court determined that Marquard's claims of ineffective assistance of counsel in the guilt phase and in the penalty phase (set forth in claims one and two, respectively) were facially sufficient and that a hearing should be held on those claims. The 3.850 court denied claims three, four, and five as procedurally barred. The 3.850 court also denied Marquard's shackling claim (claim eight) as procedurally barred.[7] The 3.850 court denied the remaining claims (six and seven) on the merits, finding that the Florida Supreme Court had already rejected a

_____

[7]The motion sought an evidentiary hearing as to all the claims asserted in the 3.850 motion, but the court did not grant the evidentiary hearing as to the shackling claim.

constitutional challenge to electrocution (claim six) and that the public records in claim seven had already been disclosed.

Marquard then again amended his 3.850 motion to assert that his death sentence should be vacated based on newly discovered evidence (1) that co-defendant Abshire's sentence had been reduced on remand to life imprisonment, and thus Marquard's death sentence was not proportional, and (2) that Abshire had admitted to Hobart Harrison, an inmate, that he had stabbed Stacey Willets and cut her neck while she was still alive.

## I. Hearing on 3.850 Motion

At the evidentiary hearing before the 3.850 court in November 1999, Marquard sought to show, inter alia, that his trial counsel was ineffective in the guilt phase in numerous ways.[8] Marquard also sought to establish that his trial

---

[8]Marquard claimed that his trial counsel was ineffective in: (1) failing to question prospective jurors about the potential emotional impact of the crime scene photos and the skeletal remains of the victim, which were presented to them; (2) failing to litigate the exclusion of the only prospective black juror; (3) failing to impeach co-defendant Abshire concerning statements he gave the police about Marquard's intoxication at the time of the murder and about Marquard's role in the crime, which allegedly were inconsistent with Abshire's trial testimony; (4) failing to call as a witness Hobart Harrison, a prison inmate with whom Abshire allegedly discussed the murder; (5) failing to obtain and present evidence that Marquard had a history of head injuries, blackout periods, and memory loss; (6) failing to present evidence that Marquard was intoxicated at the time of the murder; (7) failing to object to the introduction of victim photographs and the crime scene video and failing to hire an expert witness to counter the testimony of Dr. William Maples, a forensic anthropologist who testified for the State about the victim's skeletal remains; and (8) failing to challenge the voluntariness of Marquard's statement to the police and consent to a search of his room based on his intoxication or mental condition at the time of the statement.

30

counsel was inadequate in the penalty phase in failing to present mitigation testimony beyond Dr. Krop's testimony. Specifically, Marquard argued that his counsel should have presented more detailed testimony about his difficult and troubled childhood and the sexual and physical abuse he suffered and its effect on his mental state. Marquard also asserted that codefendant Abshire's changed story about the murder constituted new evidence that would have changed the outcome of the trial, and trial counsel was ineffective for failing to discover and present it.[9]

We now review Abshire's changed story during the 3.850 hearing and then proceed to the testimony of the witnesses presented on the mitigation issue.

1. Abshire's changed story

During the 3.850 evidentiary hearing in November 1999, Michael Abshire testified about his history with Marquard and the events the day of the murder. Abshire testified that he and Marquard habitutally drank beer, consumed ephedrine, and smoked marijuana, and they also occasionally took LSD. Abshire indicated that he and Marquard both blacked out and had memory loss at times due to their alcohol and drug use. In contrast to his trial testimony, Abshire indicated that the day of the murder, he and Marquard went to two different bars before

_____

[9]According to Marquard's 3.850 counsel, Abshire did not change his story until 1999. Abshire's death sentence was vacated in 1994 and, according to Marquard's counsel, Abshire's resentencing was in 1995. Thus, it appears that Abshire's story did not change until well after he was resentenced to life imprisonment.

31

returning to the motel and getting ready to go out. At the first bar, they drank two beers; at the second, they drank numerous beers, approximately one every ten to fifteen minutes for an uncertain period of time. At some point during the night they also drank the remains of a bottle of tequila, which was approximately four inches of the bottle, and also ingested ephedrine. Abshire stated that he did not remember exactly what his testimony was at trial or why he would have omitted the fact that he and Marquard drank many beers and tequila the day and evening of the murder, but that he was sure they had done so. However, Abshire testified that Marquard, nevertheless, was able to drive the three of them into the woods in inclement weather without incident.

With regard to the murder, Abshire testified that he stabbed Willets and cut her throat because he thought she was still alive after Marquard had stabbed her, and he wanted to put her out of her pain.

Hobart Harrison also testified briefly that Abshire claimed he, and not Marquard, had killed Willets. Harrison previously had testified at Abshire's trial that Abshire told him Abshire cut Willets's head off and left a piece of skin to hold it on. However, Harrison failed to provide any details at the 1999 evidentiary hearing, stating that he did not want any part of the case. Harrison also admitted that he was not present at the crime scene and could not know whether Abshire

32

told the truth and that Abshire seemed to be trying to impress people with how tough he was.

Garry Wood, who served along with Howard Pearl as Marquard's trial counsel, also testified about his involvement with Marquard's case. Pearl was deceased. Wood was asked about Hobart Harrison, a prison inmate with whom Abshire talked about the murder. Wood testified that he and Pearl made a strategic decision not to call Harrison as a witness in the guilt phase because Harrison's statements did not indicate that Marquard was innocent. Further, Wood would not call him in either the guilt or the penalty phase because Harrison was not credible and because Wood believed Harrison's testimony would not cause jurors to be sympathetic to either Abshire or Marquard. In addition, Wood and Pearl did not want to call Harrison because they could not control him as their witness.[10]

2. Mitigation witnesses

---

[10]Wood further testified that he did not object to the introduction of the victim's skeleton because he believed it was relevant evidence of the knife injuries and an objection would not be well-founded. Wood did not present an expert to rebut the testimony of Dr. Maples because he and Pearl were of the view that Dr. Maples was "as good as it gets in terms of forensic anthropology in his testimony in his field," and another expert opinion would not have helped them. Wood did not file a motion to suppress the evidence recovered from Marquard's room because he did not believe he had grounds.

Wood testified that he made the strategic decision not to question jurors about the probable emotional impact of the crime-scene evidence because "Ms. Willets was killed very brutally" and the "evidence in the case was very sensitive, very serious," and Wood felt that "to play that up, if you will, up front, could prejudice the entire panel, if you got into exact details about what happened or how her body was found, that sort of stuff."

33

The majority of the testimony at the 3.850 hearing related to Marquard's mitigation claim. Marquard contends that his trial counsel should have presented in the penalty phase the mitigation evidence presented in the 3.850 hearing.

At the 3.850 hearing, Mariah Harrelson testified that she was Marquard's foster mother for a period when he was about twelve or thirteen years old, after his stint in a boys' home. Harrelson testified that he was a shy, bashful child, with whom she had no problems. She described Marquard as a follower, but stated on cross-examination that he was generally able to make up his own mind and "mostly" seemed to know the difference between wrong and right. Harrelson had the impression that Marquard could not depend on his mother. His father kept telling Marquard that he would come and get him. As a result, one night Marquard took Harrelson's child's bicycle and rode approximately fifty-five miles to Jacksonville, North Carolina, where his father lived. Harrelson was never contacted in connection with Marquard's trial.

Eric Wallen, a friend of Marquard's, testified that Marquard lived with Wallen and his family for some period when they were seventeen years old. Wallen testified that they drank alcohol every day and habitually consumed a variety of drugs, including LSD and PCP. Wallen testified that Marquard was somewhat "withdrawn" and "spaced out" at times. Wallen also knew Abshire, and

34

had spent time with Abshire in county jail and state prison. He described Abshire as "a very explosive person" who was jealous in his friendships and did not like other people to come between him and his friends. According to Wallen, Marquard was not an aggressive person. Wallen was not contacted to be a witness in Marquard's trial and was in prison at the time of the trial.

Rebecca Marquard Hicks, Marquard's oldest sister, then testified about her and Marquard's childhood. Hicks testified in detail about their mother's heavy drinking. Hicks remembered her mother's violent behavior toward her but did not remember whether her mother abused Marquard or their other sister. Hicks recalled her mother often drinking all day until she passed out and also stated that her mother consumed cocaine, marijuana, and hash. Her mother took Marquard to bars with her and also consumed drugs in front of him when he was approximately ten years old. At one point Marquard, at age ten, was taken to the hospital after taking quaaludes, but their mother was passed out and did not know about the incident. Hicks was never contacted by Marquard's trial counsel and was sure that their other sister Amy also had not been contacted because she had spoken to Amy about it. Amy died in 1995.

On cross-examination, Hicks acknowledged that there was an incident in which Marquard had been accused of molesting the daughter of their sister Amy.

35

Wood, Marquard's trial counsel, testified that he and Pearl made a strategic decision to present all evidence of Marquard's childhood, emotional, and substance-abuse problems through Dr. Krop rather than through various other witnesses because they wanted Dr. Krop to "put it into a mental health perspective." As a result of Dr. Krop's specific expertise, Dr. Krop was in charge of the mitigation investigation and presentation.

With regard to his failure to contact witnesses to determine if Marquard was intoxicated when he was arrested, consented to a search, and provided a statement to the police, Wood testified that Marquard never told him he was intoxicated. Marquard apparently at some point told Dr. Krop that he had taken acid the day of the arrest, but Wood testified that the defense team concluded Marquard was not intoxicated at the time of the arrest, as follows:

> And I do recall exploring with Dr. Krop further about the ramifications of that and . . . . we did not feel, Howard Pearl and myself, based on our information in consultation with Dr. Krop, that either Mr. Marquard was incompetent to stand trial, incompetent to render any statements, insane at the time of the offense or incapable of providing a statement to the police based on any alcohol or drug ingestion.

Dr. Michael Amiel, an expert in the field of psychiatry, testified about his opinions about Marquard's substance abuse and mental state. Dr. Amiel met with Marquard three times and reviewed Marquard's history and Dr. Krop's

36

psychological testing of him. Based on his review, Dr. Amiel concluded that Marquard's impulse-control may have been mildly impaired as a result of his alcohol consumption. Based on Marquard's statement that he could not remember the incident and that he zoned out at times, Dr. Amiel was of the opinion that Marquard "might have had some kind of psychogenic amnestic period whereby he could not therefore recall what had taken place." Dr. Amiel testified that such a psychogenic amnestic period "suggests that the experience was very traumatic, and therefore, he blocked it out." Dr. Amiel further testified that Marquard had a well-documented chronic depressive disorder, and that the alcohol and drugs were self-medication. Dr. Amiel agreed with Dr. Krop's assessment of Marquard's personality disorder.

Dr. Barry Crown, an expert in the field of psychology, then testified about a battery of neuropsychological tests he administered on Marquard in 1997, at the request of Marquard's 3.850 counsel. Dr. Crown testified that Dr. Krop had not administered any of the tests he administered, which were focused more on "diffuse matters of brain development." Dr. Crown testified that the test results suggested that Marquard's problem-solving ability was at the level of a person aged fifteen years and seven months, although his vocabulary was much more advanced. The test results suggested a thought disorder and processing deficit. Dr.

37

Crown also administered a personality test that suggested a pattern of schizophrenia, paranoid type, in a "subacute stage." Dr. Crown testified that Marquard's personality and thought disorders and diminished capacity would "reduce his capacity to reason and to exercise sound judgment, particularly when he was under pressure." His difficulty in problem-solving would also make him more likely to act impulsively. However, Dr. Crown clarified that he was not diagnosing Marquard as schizophrenic; rather, he was simply reporting that a personality test Marquard took suggested schizophrenia. Dr. Crown further clarified that he was not testifying that Marquard was insane.

Cheryl Furtick testified as an expert in the field of social work. Furtick testified that Marquard's records did not contain many significant details regarding Marquard's experiences and mental health. Furtick discussed Marquard's unstable childhood and adolescence and long history of behavioral problems. She testified that Marquard as a child looked for the acceptance of others and did not receive it.

The State then presented Marquard's father, Roger Marquard. Roger Marquard testified that he divorced Marquard's mother because she drank and abused their daughters, but that she did not abuse Marquard. He further testified that Marquard lived with him from age fifteen to nineteen except for an eighteen-month stint in a hospital.

## J. Denial of 3.850 Relief

After the evidentiary hearing, the state 3.850 court denied Marquard's remaining ineffective-assistance-of-counsel claims for post-conviction relief. The 3.850 court determined that trial counsel made reasonable, strategic decisions in deciding not to question jurors about the emotional impact of the crime scene evidence and the victim's remains and not to call Hobart Harrison as a witness.[11]

In addressing Marquard's argument that counsel was ineffective in failing to obtain mitigating evidence about Marquard's mental state and substance abuse, the 3.850 court found that no evidence was presented at the hearing that Marquard suffered from any head injury, blackout periods, or memory loss. The court further found that the evidence of Marquard's drug and alcohol abuse and past mental health problems were introduced at trial through the testimony of Dr. Krop. As to the allegation that trial counsel was ineffective in failing to expand upon the intoxication and insanity defenses, the court found that there was never any

_____

[11]With regard to trial counsel's failure to properly litigate the State's exclusion of the only prospective black juror, the 3.850 court found that the juror was challenged as a result of his opposition to the death penalty and not because of his race, and thus counsel was not ineffective for failing to object. The court determined that the crime scene video and victim's photograph were admissible evidence, and thus there was no prejudice from counsel's failure to object, and that the decision not to hire an expert witness to counter Dr. Maples's testimony was a strategic decision and not ineffective assistance. As to Marquard's assertion that counsel should have impeached Abshire with the statements Abshire previously had made to the police about Marquard's intoxication and their roles in the murder, the 3.850 court found that Abshire's prior statements were in fact consistent with his trial testimony.

evidence of intoxication at the time of the crime until Abshire came up with his latest version of events, and trial counsel could not be faulted for not attempting a defense for which the factual basis did not exist at the time.[12]

With respect to the allegations that trial counsel, and Dr. Krop, were ineffective at the penalty phase, the 3.850 court found that no evidence was presented at the evidentiary hearing that would have presented mitigating circumstances in the penalty phase, and that "all relevant matters in mitigation were in fact presented at the penalty phase."

As to Marquard's assertion that Abshire's changed story was "new evidence" and that trial counsel was ineffective in failing to discover it, the court found that "this is simply the latest version of the events surrounding the homicide which is in direct conflict with Abshire's prior testimony and other evidence presented at the Defendant's trial," and therefore "there is no probability there would have been a different result at trial."

Thus, the 3.850 court found from the evidentiary hearing that trial counsel was not ineffective in either jury selection, the guilt phase, or the penalty phase of

---

[12]With regard to the issue of the search and Marquard's statement to the police, the 3.850 court found that no evidence was presented that Marquard was intoxicated at the time he consented to the search and gave the statement, or that he suffered from any mental illness that would render his consent involuntary.

Marquard's trial.[13]

## K. 3.850 Appeal

Marquard appealed the denial of his 3.850 motion for post-conviction relief and also filed a petition for writ of habeas corpus in the Florida Supreme Court. The 3.850 appeal and habeas corpus petition were consolidated in the Florida Supreme Court.

In his 3.850 appeal, Marquard raised, inter alia, these claims as claims three, four, seven, and nine:

---

[13]The 3.850 court did reserve jurisdiction to rule on Marquard's latest amendment to the 3.850 motion, which alleged that the death sentence was not proportional because Abshire received a life sentence. Marquard appealed the denial of his 3.850 motion, but the Florida Supreme Court temporarily relinquished jurisdiction for the sole purpose of allowing the 3.850 court to enter an order on the proportionality issue. After reviewing the record, the 3.850 court made the following findings as to the proportionality issue:

> The defendant, John C. Marquard, was, in fact, the dominant person in this entire course of events. It was John C. Marquard who made the decision that they should kill Stacey Willets. John Marquard drove Willetts and Abshire to the wooded area, were [sic] they eventually took her life. Marquard took both individuals through the woods to the eventual location, were [sic] he caused the death of Stacey Willetts. The defendant, John Marquard, was the individual who had the knife, who cut Stacey Willetts throat, and attempted to decapitate her, and who then handed the knife to his co-defendant[] Michael Abshire, and ordered him to stab the victim. The Court finds that Michael Abshire had no intention to kill the victim, and was merely an accomplice. The Court further finds that Abshire was acting [under] substantial domination and extreme duress from the defendant Marquard. The Court further finds that the [co-]defendant Abshire showed considerable remorse after the crime was committed. The Court finds that the totality of the aggravating circumstances, in the case of John C. Marquard, far out weighs the mitigating circumstances, which were found by the trial and sentencing court. The Court further finds that based on the totality of the circumstances in this case, that the defendant's sentence of death was, in fact, proportional.

Having denied all post-conviction relief, the 3.850 court remanded the case back to the Florida Supreme Court for further proceedings.

(3) Marquard had ineffective assistance of counsel at the penalty phase; (4) he was denied a full and fair postconviction evidentiary hearing; . . . (7) Marquard was unconstitutionally shackled during the trial; . . . [and] (9) the jury instructions during the penalty phase were vague or overbroad . . . .

Marquard v. State, 850 So. 2d at 423 n.1.[14]

In claim four, Marquard alleged that he was denied a full and fair hearing

because the 3.850 court (1) refused to permit hearsay evidence from several

_____

[14]Marquard's 3.850 appeal also raised six other claims, to wit:

(1) newly discovered evidence as to Abshire's life sentence establishes that Marquard's sentence is disproportional; (2) newly discovered evidence relative to Abshire's recent testimony requires that Marquard's sentence be reduced; . . . (5) Marquard had ineffective assistance of counsel at the guilt phase; (6) defense counsel failed to object to comments by the prosecutor and trial judge which diminished the jury's role in sentencing; . . . (8) the rule prohibiting counsel from interviewing the jurors is unconstitutional; . . . and (10) cumulative errors justify relief.

Marquard v. State, 850 So. 2d at 423 n.1. The Florida Supreme Court denied claims six and eight as procedurally barred because they should have been raised during the direct appeal, id. at 423 n.2, and disposed of the other claims on the merits.

On Marquard's first claim, that Abshire's life sentence establishes that Marquard's sentence was disproportionate, the Florida Supreme Court affirmed the trial court's determination that Marquard was more culpable. Id. at 424. As to the second claim, that Abshire's latest testimony entitled Marquard to resentencing, the Florida Supreme Court concluded that the new testimony did not significantly vary from his trial testimony or change the fact that Marquard was the more culpable defendant, as follows:

Abshire's new testimony differs only in two key aspects: (1) he contends that he and Marquard had consumed a fair amount of alcohol on the night of the crime; and (2) he states that Stacey may have still been alive when he cut her neck. Even Abshire's most recent story reveals that despite Marquard's alleged intoxication, he was still able to safely drive the car through inclement weather conditions and was able to trek through the woods and attack Stacey. Moreover, Abshire's testimony does not change the fact that Marquard was clearly the more culpable defendant.

Id. at 425.

In addressing claim five, ineffective assistance of counsel at the guilt phase, the Florida Supreme Court agreed with the 3.850 court that the various decisions made by trial counsel were reasonable, strategic decisions and did not constitute ineffective assistance. Id. at 426-27.

witnesses, and (2) failed to take judicial notice of Hobart Harrison's prior testimony from Abshire's trial proceeding on the ground that the prior testimony would be inadmissible. Id. at 425. The Florida Supreme Court affirmed the trial court's evidentiary rulings on these issues. Id. at 425-26.

As to the penalty-phase ineffectiveness claims (claim three), the Florida Supreme Court concluded that Marquard's counsel was not ineffective in deciding not to call as witnesses Harrison and David Blanks (another inmate). Id. at 428-29. It further concluded that counsel was not ineffective in failing to call witnesses other than Dr. Krop to testify about Marquard's childhood and substance-abuse history, stating: "Although other witnesses could have provided more details relative to Marquard's early life, counsel is not required to present cumulative evidence." Id. at 429-30. With respect to Marquard's assertion that his counsel failed to ensure that he received an adequate mental health evaluation, the Florida Supreme Court noted that neither Dr. Amiel nor Dr. Crown indicated that Dr. Krop had failed to give any specific tests, interviews, or other procedures. After reviewing the testimony of Dr. Amiel, Dr. Crown, and Cheryl Furtick, the Florida Supreme Court concluded that substantial evidence supported the 3.850 court's determination that all relevant matters in mitigation were in fact presented at the penalty phase. Id. at 430-31.

43

As to claim seven, the Florida Supreme Court treated Marquard's case as if shackling had occurred in the penalty phase and addressed the issue only as an ineffective-assistance-of-counsel claim for failing to object to the shackling.[15] The Florida Supreme Court concluded that "[b]ecause this occurred only during the penalty phase, and not the guilt phase, in order to show prejudice, Marquard must show that 'there is a reasonable probability that, absent trial counsel's error, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Id. at 431 (quoting Cherry v. State, 781 So. 2d 1040, 1048 (Fla. 2000)).[16] Based on the brutal facts of the case, the unanimous jury recommendation of death, and the presence of no statutory and minimal non-statutory mitigating circumstances, the Florida Supreme Court concluded that Marquard had not met his burden on the prejudice prong. Id.[17]

Finally, as to claim nine – that the jury instructions, including the HAC

_____

[15]In his 3.850 appeal, Marquard raised his shackling claim both as a substantive constitutional claim and also as an ineffective-assistance-of-counsel claim. However, the Florida Supreme Court did not discuss his substantive constitutional claim.

[16]We do not read the Florida Supreme Court's opinion as making a finding in the 3.850 appeal that Marquard was shackled at trial, but instead as assuming that shackling occurred for purposes of its decision. In any event, any such factual determination that shackling occurred would be clearly erroneous and unreasonable because, as explained earlier, there is no evidence in the record that Marquard was ever shackled. See 28 U.S.C. § 2254(d)(2). Indeed, the Florida Supreme Court did not point to any evidence of shackling in its opinion.

[17]Having found no error, the Florida Supreme Court also rejected as meritless Marquard's claim of cumulative error. Id. at 423 n.3.

44

instruction, during the penalty phase were vague and overbroad – the Florida Supreme Court determined this claim was procedurally barred in a 3.850 proceeding because it should have been raised on direct appeal. Id. at 423 n.2. However, as noted earlier, Marquard's counsel did object to the constitutionality of the HAC instruction at trial, on direct appeal, and in his 3.850 motion.

In his state habeas corpus petition, Marquard raised the following additional claims:

> (1) whether newly discovered evidence demonstrates that Marquard's death sentence is disproportional and disparate; (2) whether the prosecutor improperly introduced nonstatutory aggravators during the penalty phase; (3) whether Marquard is entitled to resentencing based on improper jury instructions; (4) whether the jury instructions shifted the burden of proof to Marquard; and (5) whether his execution is unconstitutional because Marquard may be incompetent at that time.

Id. at 431. The Florida Supreme Court summarily denied the first claim, which asserted the same claim raised and addressed in Marquard's 3.850 motion, and also summarily denied claim five as moot because it was prematurely raised. Id. at 431 n.13. The Florida Supreme Court denied the remaining claims as meritless. Id. at 431-33.

Marquard then filed in the Florida Supreme Court a motion for reconsideration, which was denied.

L.  Section 2254 Petition

On September 23, 2003, Marquard filed in the district court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, which he subsequently amended. Marquard's amended § 2254 petition raised, inter alia, these claims: (1) that Marquard's Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the jury saw him in shackles during his penalty phase, and trial counsel was constitutionally ineffective in failing to object to the shackling; (2) that trial counsel was ineffective in failing to present mitigation evidence about Marquard's background in the penalty phase; and (3) that the HAC jury instruction, among others, was unconstitutionally vague and overbroad, and that trial counsel was constitutionally ineffective in failing to litigate and preserve this issue.[18]

On April 5, 2004, the district court denied Marquard's § 2254 petition except for certain claims. On January 13, 2005, the district court entered an order denying the remaining claims.

As to Marquard's mitigation claim, the district court deferred to the Florida courts' determination that additional mitigating evidence that could have been presented about Marquard's childhood, in addition to the testimony of Dr. Krop about those topics, was cumulative, and that trial counsel's strategic decision not to

_____

[18] Marquard's amended § 2254 petition raised seventeen claims, but we focus only on the issues addressed in the certificate of appealability issued by this Court.

46

present that evidence was not ineffective. As to the alleged shackling, the district court also concluded that the Florida Supreme Court's determination that Marquard was not prejudiced by any shackling in the penalty phase of his trial was a reasonable application of clearly established federal law, and thus was entitled to deference.

As to the HAC-constitutionality claim, the district court noted that the Florida Supreme Court concluded that the constitutionality issue was procedurally barred because it should have been raised on direct appeal. The district court thus concluded that it was precluded from addressing the merits of the HAC-constitutionality issue. However, as noted earlier, Marquard in fact had challenged the constitutionality of the HAC instruction at trial, on direct appeal, and in his 3.850 motion.

As to the ineffectiveness claim based on the failure to object to the HAC instruction, the district court concluded that the HAC-ineffectiveness issue was procedurally barred because Marquard did not raise it in his 3.850 motion. It is correct that Marquard did not raise this HAC-ineffectiveness issue in his 3.850 motion – indeed, his counsel had objected to the HAC instruction at trial and on direct appeal, so there was no ineffectiveness claim to be raised.

**M. Certificate of Appealability**

This Court granted a COA on the following issues: (1) whether Petitioner Marquard's constitutional rights were violated when he was shackled in front of the jury during his penalty phase; (2) whether defense counsel was constitutionally ineffective for failing to present certain mitigation evidence during the penalty phase; (3) whether defense counsel was constitutionally ineffective for failing to challenge the constitutionality of the "Heinous, Atrocious, and Cruel" jury instruction regarding aggravating factors during the penalty phase;[19] (4) to the extent the State claims any of the above three claims are procedurally barred, whether those three claims or any of them are procedurally barred, and why; (5) what Florida law required at the time of defendant's State court trial in 1991 with regard to shackling a defendant in front of the jury, and whether defense counsel was constitutionally ineffective for failing to object to the defendant's being shackled in front of the jury in his penalty phase; and (6) to the extent the State claims that issue five above is procedurally barred, whether that issue is procedurally barred, and why.

## II. STANDARD OF REVIEW

The district court's and this Court's review of the final state judgment on Marquard's claims are pursuant to 28 U.S.C. § 2254, as amended by the Anti-

---

[19]The COA was granted before we reviewed the record and determined that Marquard's counsel had objected to the HAC instruction at trial, on direct appeal, and in the 3.850 motion.

Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132.

Our review is highly deferential.  First, § 2254(e)(1) establishes the following standard of review for factual determinations made by a state court: "[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Robinson v. Moore, 300 F.3d 1320, 1342 (11th Cir. 2002).  Second, § 2254(d) allows federal habeas relief to be granted for a claim adjudicated on the merits in state court only if the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Robinson, 300 F.3d at 1342-43.

As the Supreme Court has noted, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693, 122 S. Ct. 1843, 1849 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403-04, 120 S. Ct. 1495 (2000));

Robinson, 300 F.3d at 1343.

## III. MITIGATING EVIDENCE CLAIM

Marquard first asserts that his trial counsel was constitutionally ineffective in failing to present in the penalty phase certain mitigation evidence relating to Marquard's childhood and his mental and emotional troubles. Specifically, Marquard contends that his trial counsel did not read the host of relevant records, including school, prison, and counseling records and mental health evaluations, available for review, and instead simply forwarded those records on to Dr. Krop for his review. As a result, Marquard argues, counsel failed to contact witnesses who could and should have been called to testify at trial, and those witnesses were not presented until his 3.850 hearing.

We review the Florida courts' legal conclusions to determine if they were contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). We thus review the legal principles that govern Marquard's claim.

### A. Governing legal principles

"It is well established that the Supreme Court's decision in Strickland [v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)] is the 'controlling legal authority' to be applied to ineffective assistance of counsel claims." Robinson v.

Moore, 300 F.3d 1320, 1343 (11th Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 406 120 S. Ct. 1495 (2000)). To prevail, a petitioner "must show both incompetence and prejudice." Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000) (en banc).

The standard governing counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. "The purpose of ineffectiveness review is not to grade counsel's performance," but to determine whether that performance fell within the broad range "of what might be a reasonable approach at trial." Chandler, 218 F.3d at 1313. "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Id. (quoting Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126 (1987)). The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable. Id. at 1313-14.

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "There are countless ways to provide effective assistance in any case," id., and "it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering

51

ineffective assistance," Waters v. Thomas, 46 F.3d 1506, 1522 (11th Cir. 1995) (en banc). "Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness." Chandler, 218 F.3d at 1314. Rather, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks and citation omitted). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315. Given this strong presumption in favor of competence, this Court has recognized that the petitioner's burden of persuasion is a heavy one, and "the cases in which habeas petitioners can properly prevail are few and far between." Id. at 1315, 1313 (quotation marks, citation, and punctuation omitted).

In reviewing counsel's performance, we must "eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits

52

from witnesses who say they could have supplied additional mitigating [] evidence, had they been called or . . . had they been asked the right questions." Waters, 46 F.3d at 1513-14. However, "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Id. (quotation marks and citation omitted).

With regard to the presentation of mitigating evidence, this Court has explained that "[c]ounsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." Chandler, 218 F.3d at 1319; see Waters, 46 F.3d at 1511 ("Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."). Indeed, there is no absolute duty to introduce mitigating evidence at all. Chandler, 218 F.3d at 1319.

As for the second prong, "[a] petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is high." Robinson, 300 F.3d at 1343-44 (quotation marks, citation, and punctuation omitted). "Under the prejudice prong of Strickland, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Grayson v.

Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (quotation marks and citation omitted). Rather, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Chandler, 218 F.3d at 1312-13 (quotation marks and citation omitted).

## B. "Contrary to" Clause

Here, we easily conclude that the Florida Supreme Court's decision on the mitigation-evidence-ineffectiveness claim was not "contrary to" clearly established federal law. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S. Ct. 1495, 1523. "The 'contrary to' clause in § 2254(d)(1) suggests that the state court's decision must be substantially different from the relevant Supreme Court precedent." Robinson, 300 F.3d at 1344 (quotation marks and citations omitted). "Although a state court's decision that applies a rule that contradicts the governing Supreme Court law is 'contrary,' a state court decision that applies the correct legal rule based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal

54

court might have reached a different result relying on the same law." Id. (quotation marks and citations omitted).

The Florida Supreme Court articulated the proper governing legal principles in addressing Marquard's ineffective assistance claims. Specifically, in addressing Marquard's 3.850 ineffectiveness claim, the Florida Supreme Court noted that, pursuant to Strickland, a defendant seeking to establish a claim of ineffective assistance of counsel must prove two elements:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."

Marquard v. State, 850 So. 2d 417, 426 (Fla. 2003) (quoting Valle v. State, 778 So. 2d 960, 965 (Fla. 2001)) (other citation omitted). Marquard does not cite any case in which the Supreme Court was faced with materially indistinguishable facts and reached a decision different than that reached by the Florida Supreme Court here; nor are we aware of any such case. Thus, the Florida Supreme Court's decision is not "contrary to" clearly established federal law.

C. "Unreasonable application" Clause

We next address whether the Florida Supreme Court's decision involved an "unreasonable application" of federal law, as determined by the United States Supreme Court. The Supreme Court has clarified that this analysis is an objective one, and that "an unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002). Further, "a federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. (quotation marks and citations omitted).

On appeal in this Court, Marquard argues that his trial counsel was ineffective in failing to contact and interview several witnesses, including members of Marquard's family, who testified at his 3.850 hearing about his troubled childhood, alcohol- and substance-abuse problems, and other psychological problems. Marquard argues that trial counsel improperly relied exclusively on the testimony of Dr. Krop as to those matters, and that if the witnesses called at the 3.850 hearing had testified in his penalty phase, the outcome would have been different.

With regard to this claim, the Florida 3.850 court concluded that the testimony presented in that hearing did not support Marquard's assertion that the

testimony would have affected his penalty phase. Specifically, the 3.850 court

found as follows:

> Contrary to the allegations in the Motion, no evidence was presented that the Defendant suffers from any history of head injuries, blackout periods, or memory loss. The evidence was clear that the defendant suffers from a history of drug and alcohol abuse, which was, in fact, entered into evidence pursuant to testimony of Dr. Krop. The evidence of the Defendant's past mental health problems were also introduced pursuant to testimony of Dr. Krop. . . .
>
> . . . .
>
> . . . Contrary to the allegations in the Motion, Roger Marquard, the Defendant's father, testified that the Defendant's mother was not an alcoholic when the defendant was born and that family life was relatively normal until the Defendant was approximately five years of age. At that time the Defendant's mother became an alcoholic and the parties divorced. The Defendant's sister testified that the mother was abusive to her, but never to the Defendant. The Defendant's second sister, Amy, is deceased at this time and trial counsel cannot be faulted for failing to call her during the sentencing phase. The evidence is clear that if Amy had been called as a witness, she would have had to testify concerning the Defendant's conviction for molesting her child. No evidence was presented of any information which would have presented mitigating circumstances in the penalty phase.
>
> Contrary to the allegations in the Motion for Post Conviction Relief, no evidence was presented to show that John Marquard was ever sexually molested as a child either at home or by neighbors. There was no evidence presented at the evidentiary hearing that the Defendant's mother ever abused him, either physically or mentally. The Defendant never provided trial counsel with the names of any witnesses in mitigation. Trial counsel cannot be faulted for failing to call witnesses whose names are not disclosed by the Defendant. Jones v. State, 528 So.2d 1171, 1173 (Fla. 1988) and Highsmith v. State, 617 So.2d 825, 826 (Fla. 1st DCA 1993).

The Florida Supreme Court affirmed the findings and conclusions of the

3.850 court, concluding that the evidence was merely cumulative to the testimony of Dr. Krop, and thus that trial counsel's decision not to present the evidence did not constitute ineffective assistance:

> Dr. Krop testified relative to Marquard's history of drug use and childhood abuse and informed the jury as to the effects of this history on Marquard's present state of mind. The jury thus knew of Marquard's drug addiction, that it began at an early age, and that he had a deprived childhood. Although other witnesses could have provided more details relative to Marquard's early life, counsel is not required to present cumulative evidence. Accordingly, we do not find that Marquard's counsel was ineffective in his representation.

Marquard, 850 So. 2d at 429-30 (footnotes omitted).

The Florida Supreme Court's decision on this issue does not involve an unreasonable application of federal law. First, the 3.850 testimony does not establish any statutory mitigating factor. The only statutory factor argued at all by Marquard is: "The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." Fla. Stat. § 921.141(6)(b). Marquard seems to argue that trial counsel was ineffective in failing to present additional evidence to support this statutory mitigating factor; however, Marquard fails to establish that any such additional evidence exists. Indeed, we see no other evidence in the 3.850 transcript, or elsewhere in the record, that would support the statutory mitigating factor. We thus reject Marquard's claim that his counsel was

58

ineffective in failing to present additional evidence about this factor.[20]

Second, none of the new mitigating evidence affects the four aggravating factors presented to the jury. The jury was instructed on four aggravating factors: (1) the capital felony was committed by a person under a sentence of imprisonment or Community Control, including parole; (2) the crime was committed while he was engaged in the commission of a robbery or was committed for financial gain; (3) the crime was especially heinous, atrocious, or cruel; and (4) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The evidence presented in the 3.850 hearing simply offered more details about Marquard's troubled childhood, substance abuse, and emotional and mental problems. The evidence did not relate to his actions or state of mind at the time of the murder, and thus does not alter any of these factors. Marquard does not argue otherwise.

---

[20]Marquard also seems to argue that trial counsel failed to conduct a reasonable investigation to uncover evidence supporting this statutory mitigating factor. However, the Supreme Court has clearly stated that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins v. Smith, 539 U.S. 510, 533, 123 S. Ct. 2527, 2541 (2003). Rather, a decision not to investigate further is reviewed for "reasonableness in all the circumstances." Id. at 521(quotation marks and citation omitted).

Marquard's trial counsel presented, through Dr. Krop, voluminous and detailed evidence about Marquard's childhood, substance abuse, and mental and emotional state, and Marquard has presented no evidence suggesting that a further or different investigation was warranted. Under these circumstances, there is no evidence to suggest that the investigation conducted by Marquard's counsel was unreasonable. In any event, even assuming that trial counsel erred in not investigating further, Marquard has presented no evidence that such an investigation would have yielded helpful mitigating evidence, and thus he has failed to establish prejudice.

Third, the new mitigation evidence does not affect any of the nonstatutory mitigating factors applicable here. As noted by the 3.850 court and Florida Supreme Court, Dr. Krop testified extensively at trial about Marquard's deprived and difficult childhood, his history of substance abuse, and his personality disorders. The sentencing court at trial found on that basis that Marquard "had an unstable family life as a child and lacked the emotional support and care he should have received," and that Marquard had a "difficult childhood," an alcoholic mother, used various drugs and suffered from personality disorders. The sentencing court further stated that "[t]he strongest mitigating circumstance is defendant's difficult childhood. He did not have a stable home. He was in a group home, a therapeutic foster home, and the state hospital. He lived with an alcoholic mother."

However, the sentencing court further concluded that the aggravating factors overwhelmed the mitigating factors. The evidence presented at the 3.850 hearing simply added unnecessary detail about these same issues, which were already adequately established by Dr. Krop's testimony at trial and acknowledged by the sentencing court.[21] There is no reason to believe that added details about

---

[21]At oral argument Marquard's counsel pointed out that Dr. Krop testified that Marquard was referred from the boys' home to a "therapeutic" foster home and indicated that Marquard had in fact been placed in such a foster home. In her testimony at the 3.850 hearing, however, Mariah Harrelson, Marquard's foster mother when he left the boys' home, testified that her

Marquard's troubled childhood and substance abuse – which the sentencing court clearly recognized in imposing a death sentence – would have had any effect on the sentence. Accordingly, the new mitigation evidence offered at the 3.850 hearing was cumulative, and trial counsel was not ineffective in failing to present it. See Van Poyck v. Florida Dep't. of Corrs., 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative.").

In addition, as the 3.850 court noted, the presentation of certain witnesses would have involved presentation of evidence damaging to Marquard. For example, had Marquard's sister Amy been called upon to testify about their upbringing, she likely would have testified about Marquard's conviction for molesting her child.

Under these circumstances, trial counsel's decision to present mitigation evidence regarding Marquard's childhood, substance abuse, and emotional and mental problems through Dr. Krop rather than through the other witnesses who

home was not a "therapeutic" foster home but was just a "regular foster home." Marquard argues that the jury was led by Dr. Krop to believe that Marquard had received certain therapy that he did not actually receive and that he was prejudiced by this misinformation. Even if the jurors might have misunderstood this minor point, Marquard was thirteen or fourteen at that time, and we cannot conceive of any way in which this misstatement could have affected Marquard's sentence.

testified at the 3.850 hearing is a classic example of a strategic decision not to be second-guessed by this Court. See Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004) ("'Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'") (quoting Waters, 46 F.3d at 1512). This tactical decision cannot be considered ineffective assistance of counsel. Accordingly, the Florida Supreme Court's decision in Marquard's 3.850 appeal that he failed to establish ineffective assistance of counsel as to or in regard to the mitigation evidence did not involve an unreasonable application of federal law.

## IV. SHACKLING CLAIMS

On appeal, Marquard next raises a due process claim based on his being handcuffed before the jury in the penalty phase and an ineffective-assistance-of-counsel claim based on his trial counsel's failing to object to this shackling during the penalty phase. Thus, Marquard raises both a substantive constitutional claim and an ineffective-assistance-of-counsel claim based on shackling (the "IAC-shackling" claim), which we address in turn.

### A. Due Process Claim

#### 1. No Evidence of Shackling in the Record

As noted earlier, this Court ordered supplemental briefs setting forth the

factual basis for Marquard's shackling claims, including citations to the record. The government's brief submits that the state trial record contains no evidence or indication of Marquard's ever being shackled at any time during the trial. The government emphasizes that Marquard also presented no affidavit or proffer in his state post-conviction proceedings as to his ever being shackled during the trial. In response, Marquard's brief provides only one citation in the state trial record where he alleges shackling occurred during the trial. As noted earlier, Marquard's record citation is to the jury-selection proceedings in the guilt phase, not in the penalty phase. Even as to jury selection during the guilt phase, the record citation, given by Marquard and quoted earlier, also does not show that Marquard was shackled in the presence of the jury.

At the outset, we thus conclude that there is no evidence in this record that Marquard was ever shackled before the jury during the penalty phase. Accordingly, Marquard's due process claim based on shackling during the penalty phase is without merit.

Before leaving this evidentiary matter, we do note that Marquard's 3.850 motion asked for an evidentiary hearing on all claims, which necessarily included his shackling claim. The 3.850 court granted Marquard an evidentiary hearing as to his ineffective-assistance-of-counsel claim based on insufficient mitigating

63

evidence in the penalty phase but not as to his due process or IAC-shackling claims based on shackling in the penalty phase. However, no evidentiary hearing was necessary for Marquard to present evidence of shackling before the 3.850 court. The shackling allegedly happened to Marquard himself, and thus his 3.850 counsel easily could have filed an affidavit from Marquard attesting to that effect. In addition, during the evidentiary hearing on Marquard's mitigation claims, the 3.850 court also allowed Marquard's counsel to make a proffer as to a separate claim based on alleged ineffective assistance during voir dire.[22] In contrast, Marquard and his counsel never asked to make a proffer, nor made a proffer, stating when, where, and for how long he was allegedly shackled during the penalty phase. Indeed, Marquard's 3.850 counsel called Marquard's former trial attorney as a witness during the 3.850 evidentiary hearing, but never asked

---

[22]In his direct examination of Marquard's trial counsel, Marquard's 3.850 counsel proffered questions about trial counsel not hiring a jury consultant for voir dire after the State objected that the questions were outside the scope of the 3.850 motion:

> THE COURT:      I don't believe that there was any allegation that counsel was ineffective during voir dire.
>
> . . . .
>
> [3.850 COUNSEL]:  Judge, may I proffer the question for the record?
> [THE COURT]:      Proffer it.
> [BY 3.850 COUNSEL]
> Q:  Did you hire a jury consultant in this case to help with jury selection?
> A:  No.
> Q:  Did you have any discussion with Mr. Pearl about that?
> A:  No.
> [THE STATE]:      Is that the end of the proffer?
> [3.850 COUNSEL]:  Yes.

Marquard's former trial attorney whether Marquard was shackled before the jury during the penalty phase. Thus, Marquard and his 3.850 counsel had ample opportunity to present an affidavit, or at least a proffer, that Marquard was shackled, but failed to develop any type of factual predicate for his shackling claims in his post-conviction state court proceedings.

Alternatively, even assuming that Marquard was handcuffed at some point before the jury in the penalty phase, his due process claim based on shackling is procedurally barred for the reasons explained below.

## 2. Procedural Bar as to Due Process Claim

The 3.850 court concluded that Marquard's substantive shackling claim was procedurally barred under Florida law because it "has been or should have been raised" on direct appeal. Reviewing the state court record, we find that Marquard did <u>not</u> raise the substantive shackling issue in the state trial court or on direct appeal. Rather, Marquard first raised his substantive shackling claim in his 3.850 motion. Because Marquard's shackling claim was not raised at trial or on direct appeal, we conclude that the state 3.850 court's procedural-bar determination under Florida law rests on an independent and adequate state ground that precludes federal habeas consideration of this issue. See <u>LeCroy v. Fla. Dept. of Corrs.</u>, 421

65

F.3d 1237, 1260 (11th Cir. 2005).[23]

### 3. Non-retroactivity of Deck v. Missouri

Even if Marquard's substantive shackling claim is not procedurally barred, Marquard has failed to establish that, at the time of his trial in 1993, the alleged shackling during the penalty phase violated his federal constitutional rights to due process.

In arguing that his due process rights were violated in the penalty phase, Marquard relies on the United States Supreme Court's recent decision in Deck v. Missouri, 125 S. Ct. 2007, 2014-15 (2005). The Supreme Court in Deck announced this new constitutional rule of criminal procedure: that routine shackling during the penalty phase of a capital trial, without a case-specific finding that security needs justify the shackling, violates a defendant's due process rights unless the state shows beyond a reasonable doubt that the shackling did not contribute to the verdict.[24]

---

[23]The only cause cited by Marquard for the failure to raise the substantive shackling claim at trial is the alleged ineffective-assistance-of-counsel claim, which claim, as explained below, lacks merit as well. Thus, Marquard has failed to establish cause for his failure to raise this substantive shackling issue in the Florida state courts.

[24]The Supreme Court in Deck cautioned that this "constitutional requirement, however, is not absolute" but "[i]t permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." Deck, 125 S. Ct. at 2014-15. The determination of whether shackling is warranted "must be case specific" and "should reflect particular concerns, say special security needs or escape risks, related to the defendant or trial." Id. at 2015.

The problem for Marquard is that Deck establishes a new rule that does not apply retroactively to Marquard's § 2254 petition. See Turner v. Crosby, 339 F.3d 1247, 1282-83 (11th Cir. 2003), cert. denied, 541 U.S. 1034, 124 S. Ct. 2104 (2004); Teague v. Lane, 489 U.S. 288, 310-313, 109 S. Ct. 1060, 1075-77 (1989). Under Teague, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government [or] . . . if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 109 S. Ct. at 1070; Turner, 339 F.3d at 1284. Supreme Court precedent as to shackling prior to Deck did not involve the penalty phase of a capital trial. Rather, prior Supreme Court precedent as to shackling in the presence of a jury involved only shackling before a determination of guilt. See Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 1345-46 (1986), Illinois v. Allen, 397 U.S. 337, 343-344, 90 S. Ct. 1057 (1970)). In fact, until Deck, the Supreme Court had not addressed at all the very different issue of shackling during the penalty phase of a capital trial where the defendant has already been convicted of a serious, violent crime by the jury. While the Supreme Court's prior precedent regarding shackling before a guilty determination "may have been a harbinger" of the Deck decision, prior precedent did not dictate the application of that precedent to the penalty phase after a capital conviction by the jury. See Turner, 339 F.3d at

67

1284-85 (concluding that the Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428 (2002), in which it extended to capital cases the rule previously announced in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000), was a new rule).[25]

In addition, neither of <u>Teague</u>'s two narrow exceptions to the general rule of non-retroactivity applies here.  Under <u>Teague</u>, "[a] new rule should be applied retroactively only if it (1) 'places certain kinds of primary private individual conduct beyond the power of the criminal law-making authority to proscribe,' or (2) 'requires the observance of those procedures that . . . are implicit in the concept of ordered liberty.'"  <u>McCoy v. United States</u>, 266 F.3d 1245, 1255 (11th Cir. 2001) (quoting <u>Teague</u>, 489 U.S. at 307, 109 S. Ct. 1060).

The first exception is inapplicable because <u>Deck</u>'s new rule does not "narrow the scope of a criminal statute by interpreting its terms" or "place particular conduct or persons covered by the statute beyond the State's power to punish," but rather regulates "only the <u>manner of determining</u>" the defendant's

---

[25]Furthermore, the reasoning supporting the pre-conviction precedent did not dictate its application to the penalty phase of a capital trial.  Where a defendant is handcuffed before the jury, the paramount constitutional concern expressed by prior precedent is that the sight of the defendant shackled could undermine the presumption of innocence by conveying the impression that the defendant is dangerous.  <u>See</u> <u>Holbrook</u>, 475 U.S. at 568-69, 106 S. Ct. 1340.  In the penalty phase of a capital case, the defendant's guilt of a serious, violent crime has already been established.  Thus, the main reasoning of the Supreme Court's pre-conviction precedent did not dictate the penalty-phase rule established in <u>Deck</u>.

sentence. Schriro v. Summerlin, 124 S. Ct. 2519, 2522-23 (2004).[26] Deck's new rule is clearly one of procedure rather than substance.

The second exception is also not met because Deck's new rule is not one of those "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings." Schriro, 124 S. Ct. at 2523 (quotation marks and citations omitted). "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is seriously diminished." Id. (quotation marks and citation omitted). Indeed, the Supreme Court has explained that "[t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." Id. (quotation marks, citations, and punctuation omitted).

Deck's new rule – that routine shackling during the penalty phase of a capital trial, without a case specific finding that security needs require shackling, violates due process unless the state shows it did not contribute to the verdict – is indisputably important for defendants. However, Deck's new constitutional rule is

---

[26]Certain new substantive rules that narrow the scope of a criminal statute "apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." Schriro, 124 S. Ct. at 2522-23 (quotation marks and citations omitted). New rules of procedure, on the other hand, generally do not apply retroactively because "[t]hey do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with the use of the invalidated procedure might have been acquitted otherwise." Id. at 2523.

69

not absolute, and a defendant may be shackled before the jury if the trial court determines that security needs or other factors so dictate. Accordingly, the absence of the Deck rule does not cast serious doubt on the accuracy or fundamental fairness of the proceedings, and thus does not fall within the narrow exception for watershed procedural rules. As a result, Deck's new rule for the penalty phase of a capital trial does not apply retroactively to Marquard's case. Therefore, Marquard has not shown that any assumed shackling during the penalty phase violated his federal due process rights in 1993.

## B. IAC-shackling Claim

As for Marquard's IAC-shackling claim, Marquard argues that his trial counsel was ineffective for failing to object to his being shackled before the jury during the penalty phase. Marquard raised the IAC-shackling claim in his 3.850 motion and in his appeal of the denial of his 3.850 motion. The Florida Supreme Court affirmed the denial of Marquard's IAC-shackling claim in his 3.850 motion. In Marquard's 3.850 appeal, the Florida Supreme Court did not mention the performance prong or any evidence of shackling. Marquard v. State, 850 So.2d 417, 431 (Fla. 2002). Rather, the Florida Supreme Court ruled on only the prejudice prong of Marquard's IAC-shackling claim. Id.

As to the prejudice prong, the Florida Supreme Court determined that "in

70

order to show prejudice, Marquard must show that 'there is a reasonable probability that, absent trial counsel's error, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Id. (citation omitted).

In concluding that Marquard had not met this standard, the Florida Supreme Court emphasized that: (1) "Marquard coldly and carefully planned to murder his girlfriend because he was tired of her bickering and wanted her car and money"; (2) "[h]e made up a story to entice her into the woods, stabbed her, drowned her, directed his friend to stab her, and then tried to decapitate her"; (3) "[a]fter she was dead, he searched her pockets for money and car keys and divided her possessions with his codefendant"; (4) "[t]he jury unanimously recommended a sentence of death"; and (5) the trial court imposed the death sentence "after finding four aggravating circumstances, no statutory mitigating circumstances, and minimal nonstatutory mitigating circumstances." Id. The Florida Supreme Court specifically concluded that "there is no reasonable probability that but for the shackling of [Marquard], the sentencer would have concluded that the defendant did not deserve a death sentence." Id.

Under the circumstances of this case – a brutal, premeditated murder, a unanimous jury recommendation of a death sentence, and a sentencing judge's

71

finding of four aggravating and no statutory mitigating evidence – we cannot say that the Florida Supreme Court's decision on the prejudice prong of Marquard's IAC-shackling claim is contrary to or involves an unreasonable application of federal law or involves an unreasonable determination of facts.

Furthermore, Deck does not undermine the Florida Supreme Court's decision on Marquard's IAC-shackling claim or help his IAC-shackling claim for several reasons. First, as explained above, Deck does not apply retroactively to Marquard's case. Second, Marquard's trial counsel's performance was not ineffective in failing to contemplate Deck. See Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'") (citations to three other Eleventh Circuit decisions omitted); Thompson v. Wainwright, 787 F.2d 1447, 1459 n.8 (11th Cir. 1986) ("[D]efendants are not entitled to an attorney capable of foreseeing the future development of constitutional law.").

Third, Deck did not involve an IAC-shackling claim on collateral review but instead involved a direct appeal where trial counsel objected to shackling before the jury. While Deck shifted the burden to the state on direct appeal to prove that routine shackling without a specific-needs inquiry did not contribute to the verdict,

72

Deck did not address, much less alter, the burden and different required prejudice showing on Marquard's IAC-shackling claim. After Deck, Marquard still has the burden in his IAC-shackling claim to establish a reasonable probability that, but for his trial counsel's failure to object to shackling, the result of his sentencing would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984) (holding that to establish a Sixth Amendment violation a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[27]

Thus, in this case, Marquard still must show a reasonable probability that, absent his being shackled, the sentencer would have concluded that the balance of aggravating factors and mitigating factors did not warrant death and would have imposed a life sentence. See Strickland, 466 U.S. at 695, 104 S. Ct. at 2069 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."); Chandler v. United States, 218

---

[27]The United States Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. 2052.

73

F.3d 1305, 1312-13 (11th Cir. 2000) (en banc) (quotation marks and citations omitted); Earhart v. Johnson, 132 F.3d 1062, 1067 (5th Cir. 1998) (concluding that even if counsel's failure to obtain expert testimony would have mandated reversal on direct appeal, the defendant still must show that the expert's testimony would have altered the outcome of the trial in order to succeed on an ineffective-assistance claim for failure to call the expert).

Marquard's burden of establishing this second prong is "high." Robinson v. Moore, 300 F.3d 1320, 1343-44 (11th Cir. 2002). Again, given the brutal, premeditated murder, the unanimous jury recommendation of death, and the four aggravating and no mitigating circumstances of this case, the Florida Supreme Court's decision that Marquard has not met this burden is not an unreasonable application of federal law as to the second prong of his IAC-shackling claim.[28] Marquard's failure to show a reasonable probability that his not being shackled during the penalty phase would have altered the outcome of his sentencing is fatal

---

[28]When a defendant is shackled without the trial court's making a factual inquiry into the necessity of the shackles, the Florida Supreme Court appears to follow the same approach: that is, such a shackling claim timely raised on direct appeal may warrant a new trial unless the government shows the error was harmless, but post-conviction IAC claims based on failure to object to shackling at trial do not warrant a new trial unless the defendant shows "'that there is a reasonable probability that, absent trial counsel's error, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Compare Marquard v. State, 850 So.2d 417, 431 (Fla. 2002) (quoting Cherry v. State, 781 So. 2d 1040, 1048 (Fla. 2000)) with Bryant v. State of Fla., 785 So.2d 422, 429 (Fla. 2001) (applying harmless-error standard to a shackling claim rejected by trial court and raised on direct appeal), and Bello v. State of Fla., 547 So.2d 914, 918 (Fla. 1989) (same).

to his habeas IAC-shackling claim.

## V. HAC INSTRUCTION CLAIM

On appeal, Marquard next argues that his trial counsel was ineffective in failing to object to the HAC jury instruction on the ground that the instruction was unconstitutionally vague and in failing to preserve that objection.[29] This argument is misguided, as Marquard's trial counsel raised the issue at trial and preserved the issue for appeal.

Indeed, Marquard's trial counsel objected in writing to the HAC instruction on the ground that it was unconstitutionally vague. Trial counsel then again objected at trial, arguing that the HAC instruction was unconstitutionally vague and failed genuinely to limit the class of cases to which it applied. Trial counsel also asked that the trial court, if it decided to give the instruction anyway, further to instruct the jury that any event that occurred after unconsciousness began or death occurred could not be considered as evidence of the especially wicked, evil, atrocious, cruel nature of the crime. The trial court denied the objection to the constitutionality of the instruction but did give the additional limiting instruction

---

[29]On appeal, Marquard also argues that trial counsel failed adequately to challenge the factual predicate for this aggravating factor because counsel did not properly impeach the witnesses against Marquard. Marqaurd also argues that newly discovered evidence demonstrates that Marquard was intoxicated at the time of the murder, and thus did not have the requisite intent to kill the victim. These issues are outside the scope of the COA granted by this Court, and thus we do not address them.

suggested by Marquard's trial counsel.

On direct appeal, appellate counsel again challenged the HAC instruction's constitutionality. Specifically, in Marquard's brief under "Point XII: Constitutionality of Section 921.141, Florida Statutes," Marquard's counsel noted that trial counsel had objected to the standard instructions and that the objections had been overruled. The HAC instruction was clearly part of the standard instructions.[30] Further, Marquard's brief on direct appeal stated that "Appellant again asserts each objection to the Standard Instructions and argues that the trial court's ruling denied due process, a fair trial and a reliable sentencing recommendation" in violation of the Fifth, Sixth, Eighteenth, and Fourteenth Amendments. In subsection (i), entitled "Heinous, Atrocious, or Cruel," Marquard's counsel again explicitly objected to the HAC instruction as unconstitutionally vague and arbitrary. The Florida Supreme Court addressed this issue and concluded that it lacked merit. Marquard v. State, 641 So.2d 54, 58 n.4 (Fla. 1994).

Notwithstanding that both trial and appellate counsel raised the issue of the constitutionality of the HAC instruction and the Florida Supreme Court denied the

---

[30]We note that in addition to the standard HAC instruction, the trial court did add on some limiting language at the request of Marquard's counsel.

claim on the merits on direct appeal, the Florida Supreme Court concluded in its 3.850 opinion that the issue was procedurally barred because it should have been raised on direct appeal. Marquard v. State, 850 So. 2d 417, 423 n.2 (Fla. 2002). On appeal, Marquard does not challenge this conclusion, but argues instead that trial counsel was ineffective in failing properly to raise and preserve the HAC-constitutionality issue. Because both trial and appellate counsel raised the issue and the Florida courts addressed it on the merits, this ineffective-assistance-of-counsel argument lacks merit.[31]

Even if counsel did not adequately object at trial and on direct appeal, the HAC instruction is not unconstitutional in any event. Thus, Marquard cannot show that he was prejudiced by any failure by counsel to raise or preserve this HAC-constitutionality issue. The Supreme Court has held that the words "especially heinous, atrocious, or cruel," when used alone as an aggravating factor, are so vague as to offend the Eighth Amendment. See Maynard v. Cartright, 486 U.S. 356, 365, 108 S. Ct. 1853 (1988); Bradley v. Nagle, 212 F.3d 559, 570 (11th Cir. 2000). "Thus, in order to apply that aggravating factor in a constitutional manner,

---

[31]As noted earlier, Marquard's 3.850 motion did not raise an HAC-ineffective-assistance-of-counsel claim. Thus, the district court correctly concluded that the HAC ineffective-assistance-of-counsel claim is procedurally defaulted. It appears Marquard raised that HAC-ineffectiveness claim in his § 2254 petition because the Florida Supreme Court in the 3.850 appeal concluded, albeit wrongly, that this HAC-constitutional claim was procedurally barred as it was not raised on direct appeal.

the sentencing court must give a limiting instruction to the jury." Bradley, 212 F.3d at 570.

Under this Court's precedent, a "court's consideration of the 'especially heinous, atrocious or cruel' aggravating factor must satisfy a three part test." Lindsey v. Thigpen, 875 F.2d 1509, 1514 (11th Cir. 1989). "First, the appellate courts of the state must have narrowed the meaning of the words by consistently limiting their application to a relatively narrow class of cases, so that their use informs the sentencer of what it must find before it imposes the death penalty." Lindsey, 875 F.2d at 1514 (quotation marks and citations omitted). This Court already has established that "Florida has sufficiently limited its 'heinous, atrocious, or cruel' aggravating circumstance to pass constitutional scrutiny."[32] Scott v. Singletary, 38 F.3d 1547, 1554 (11th Cir. 1994) (quotation marks and citation omitted); Scott v. Dugger, 891 F.2d 800, 806 (11th Cir. 1989); see also Bradley,

_____

[32]The trial court gave the following HAC instruction to the jury:
"Heinous" means "extremely wicked or shockingly evil." "Atrocious" means "outrageously wicked and evil." "Cruel" means "designed to inflict a high degree of pain with utter indifference to or enjoyment of the suffering of others."
    The kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional acts that show that the crime was consciousless or pitiless and was unnecessarily torturous to the victim. If the victim in this case lost consciousness, any event which occurred after unconsciousness began cannot be considered as evidence of the especially – especially wicked, evil, atrocious or cruel nature of the crime. Any event after the death of the victim cannot be considered as evidence of the especially wicked, evil, atrocious or cruel nature of the crime . . . .

212 F.3d at 570-71 (concluding that similar instruction on Alabama HAC statutory aggravating factor was sufficiently limiting as to be constitutional).[33]

Second, "the sentencing court must have made either an explicit finding that the crime was 'especially heinous, atrocious or cruel' or an explicit finding that the crime exhibited the narrowing characteristics" implemented by the state courts. Lindsey, 875 F.2d at 1514; Bradley, 212 F.3d at 570. Here, the sentencing court made such explicit findings and detailed the acts supporting the HAC aggravating factor.[34]

---

[33]Marquard seems to argue that the trial court was required to instruct the jury that it must find that the defendant "intended" to inflict unnecessary torture to the victim. Marquard cites no precedent that would require such an instruction. As discussed, under this Court's precedent, the HAC instruction given by the trial court was constitutional.

[34]Specifically, the state sentencing court at trial stated as follows:
Chopping and stabbing and attempting to drown a defenseless, unsuspecting 22-year-old woman with a Bowie knife, a dagger and attempting to cut her head off with a Gurka head knife is extremely wicked and shockingly evil. Such conduct is designed to inflict a high degree with indifference to the suffering of Stacey Ann Willets.

Marquard cut her throat, stabbed her in the chest and attempted to drown her and attempted to behead her. Mr. Marquard threw her to the ground after cutting her throat and stabbing her. He held her face under water until she stopped breathing. When she started breathing again, he then held her face under water until she finally stopped breathing.

Abshire stabbed her at Marquard's instruction. Then Marquard struck the back of her neck with his Gurka head knife. Abshire did the same thing with his Bowie knife.

Stacey did not die instantly. She was breathing when Marquard first tried to drown her. She started breathing after the first attempt. Marquard again tried to drown her.

The attack was without provocation, and she vainly sought to defend herself by struggling. Marquard had one hand over her mouth and a knife in the other hand cutting her throat and stabbing her in the chest.

Attempting to drown the victim is comparable to strangulation and would

79

Third, the sentencer's conclusion as to step two "must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply." Lindsey, 875 F.2d at 1514; Bradley, 212 F.3d at 570-71. In other words, to reverse under step three, this Court would have to find that the Florida courts' determination that Marquard's conduct was "unnecessarily torturous to the victim" was clearly erroneous. Bradley, 212 F.3d at 571. Given the evidence in this case that Marquard stabbed the victim, threw her to the ground, tried to drown her, and hacked at her neck with a knife, and that she did not die immediately but tried to struggle, we cannot conclude that the state court's determination was clearly erroneous.[35]

Accordingly, to the extent the substantive HAC issue is properly before this Court as part of the prejudice prong, we conclude that the Florida Supreme Court's decision – that the HAC constitutionality claim lacks merit – was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

## VI. CONCLUSION

For the foregoing reasons, the district court properly denied Marqurad's 28

_____

involve foreknowledge of death, extreme anxiety or fear.

[35]Because we conclude that Marquard's trial counsel was not ineffective and that there was no error on this issue, we need not determine whether any such error would be prejudicial or harmless. We do note, however, that the sentencing court found three other aggravating factors as well as the HAC factor.

80

U.S.C. § 2254 petition, and we affirm that denial.

**AFFIRMED.**